IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

TIA LYN NICOLE SULU-KERR, *Appellant*.

No. 1 CA-CR 22-0565
FILED 01-25-2024

Appeal from the Superior Court in Yuma County
No. S1400CR202100038
The Honorable Brandon S. Kinsey, Judge (Retired)

**AFFIRMED IN PART; VACATED IN PART; REMANDED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Andrew Reilly
*Counsel for Appellee*

Yuma County Public Defender's Office, Yuma
By Robert J. Trebilcock
*Counsel for Appellant*

_____

**OPINION**

Presiding Judge D. Steven Williams delivered the Court's opinion, in which Judge Samuel A. Thumma and Judge Paul J. McMurdie joined.

_____

**W I L L I A M S**, Judge:

¶1        In Arizona, a person generally may avail herself of a self-defense justification as a defense to a Title 13 charge only if she acted with force *after* another's use of unlawful force. But an occupant of a vehicle facing a forceful entry or removal by another may respond with force even if the other's force is lawful and occurs during the occupant's commission of an unlawful act. Here, defendant Tia Sulu-Kerr appeals her convictions and sentences for leaving the scene of a fatal accident, theft of means of transportation, aggravated assault, and negligent homicide (a lesser included offense of manslaughter). Because the jury was not instructed on justification while in an occupied vehicle — preventing Sulu-Kerr from fully claiming justification for her actions — we vacate the aggravated assault and negligent homicide convictions and sentences, and remand for a new trial on those counts. We otherwise affirm.

**FACTUAL AND PROCEDURAL HISTORY**

¶2        After spending an evening together at a casino, Amber Rodriguez offered her housemate, Sulu-Kerr, and another friend, M.Y., the vehicle she had been using (a Ford Flex) to drive home. Rodriguez had stolen the Ford a month earlier from a friend's brother, J.B., who apparently did not report the Ford stolen after Rodriguez took it.

¶3        Sulu-Kerr left the casino shortly before dawn and drove, with M.Y. in the passenger seat, to a gas station. When they pulled up to a gas pump, J.B. and his brother, M.B., suddenly appeared and rushed the vehicle. J.B. ran to the open driver-side window and ordered Sulu-Kerr to "get out of the car," yelling it was "[his] car." Sulu-Kerr had never seen the men before and pulled forward, hitting M.B., who fell under the Ford and suffered a fatal head injury. Sulu-Kerr then drove away. She sent three text messages to Rodriguez in quick succession about what "went down at Circle K." She later told Rodriguez she "tried to take off" after a man "jumped in the window," frightened that he may kill her.

¶4          Police officers quickly located the Ford, traced it to Rodriguez, and questioned her about the incident. After speaking with officers, Rodriguez warned Sulu-Kerr that police were looking for the driver of "the hit and run" and "if she was still in Arizona . . . she should leave."

¶5          While trying to locate Sulu-Kerr, police spoke to her daughter. The daughter relayed Sulu-Kerr's account, telling an officer that two men had accosted Sulu-Kerr at a gas station, with one man ordering her to "get out of the car" and the other man "jump[ing] onto the hood" of the vehicle. According to the daughter, Sulu-Kerr admitted running over the second man as she "left the scene." She also acknowledged that police were looking for her, explaining she had not contacted law enforcement because she "was scared."

¶6          More than a month after the incident, Sulu-Kerr contacted the police and was interviewed. She denied knowing the Ford was stolen but admitted that Rodriguez had made statements indicating she did not rightfully possess the vehicle. When questioned about the gas station incident, Sulu-Kerr explained she was so focused on J.B. standing just outside her open window that she never looked at M.B., whom she could hear yelling back and forth with M.Y. Sulu-Kerr told police she believed J.B. was attempting to carjack them. Claiming she feared for her safety when she saw J.B. reach toward his pocket to possibly pull out a gun, Sulu-Kerr said that she put the vehicle in reverse, heard a loud noise as though someone had jumped on the hood, then put the vehicle into drive and drove off. Although she denied seeing it, Sulu-Kerr admitted she knew she ran over something when she drove away.

¶7          The State charged Sulu-Kerr with leaving the scene of a fatal accident, theft of means of transportation, aggravated assault, and manslaughter. At trial, defense counsel argued that Sulu-Kerr had acted in self-defense, not knowing the Ford was stolen and believing her safety was in jeopardy when she hit M.B. and drove away. Rodriguez testified that she "believe[d]" she told Sulu-Kerr the car was stolen but explained she could not clearly recall because of her substance use.[1] M.Y. testified that J.B. and M.B. "came out of nowhere" and that one or the other ordered him and Sulu-Kerr out of the vehicle, slammed the hood, "tried to open the door," reached into the vehicle through the open driver-side window, and then reached into a bag or backpack—at which point M.Y. put his head between his legs and Sulu-Kerr drove off. Acknowledging that he "felt something

---

[1]          Rodriguez pled guilty to stealing the Ford and was on probation for the conviction at the time of Sulu-Kerr's trial.

go underneath [the vehicle]" as Sulu-Kerr drove away, M.Y. testified that he told Sulu-Kerr to "go, keep going" because he "didn't want to hear them shots go off."

**¶8**         Surveillance video footage showed J.B. holding something in his hand and later showed him running toward the Ford.[2] Because of the camera angle, the video captured only some of the incident: (1) J.B. running toward the driver-side door, (2) M.B. rushing toward the front or passenger side of the vehicle, at which point he moved outside the camera's frame, and (3) Sulu-Kerr pulling away within a few seconds. No gun was found at the gas station.

**¶9**         Jurors found Sulu-Kerr guilty of the lesser-included offense of negligent homicide after failing to agree on the manslaughter charge. They otherwise found her guilty as charged on the remaining counts. The trial court sentenced Sulu-Kerr to concurrent and consecutive prison terms totaling 12.5 years.

**¶10**         Sulu-Kerr timely appealed. We have jurisdiction under Article 6, Section 9, of the Arizona Constitution and A.R.S. §§ 12-120.21(A)(1), 13-4031, and -4033(A)(1).

## DISCUSSION

*I.    Self-Defense as a Justification for Leaving the Scene of a Fatal Accident*

**¶11**         Before trial, the State moved for a ruling, and corresponding jury instruction, that self-defense did not apply to the charges of leaving the scene of a fatal accident and theft of means of transportation. Sulu-Kerr agreed that self-defense did not justify the theft charge but argued jurors should consider whether it justified leaving the scene of a fatal accident. The trial court granted the State's motion and told the jurors that the instructions for self-defense applied only to the aggravated assault and manslaughter charges.

**¶12**         On appeal, Sulu-Kerr reasserts her argument that self-defense may justify conduct that would otherwise constitute leaving the scene of a fatal accident. Arizona law is contrary.

---

[2]     Video surveillance showed J.B. and M.B. using bolt cutters to break into a coin machine at a car wash next to the gas station before Sulu-Kerr arrived. The court precluded the video evidence at trial.

¶13    The legislature's authority "to define what constitutes a crime in this state . . . also extends, at least within constitutional bounds, to defenses." *State v. Holle*, 240 Ariz. 300, 302, ¶ 9 (2016); *see also State v. Bayardi*, 230 Ariz. 195, 198, ¶ 13 (App. 2012) ("Defenses to criminal charges under Arizona law are statutory.") (citing A.R.S. § 13-103(A)). The legislature has specified that the justification defenses set forth in Title 13—the criminal code—may be offered as "a defense in any prosecution for an offense *pursuant to this title*." A.R.S. § 13-401(B) (emphasis added). Leaving the scene of a fatal accident, A.R.S. § 28-661, falls not within Title 13 but within Title 28. As this court has previously held, the express language of A.R.S. § 13-401(B) limits justification defenses to Title 13 offenses. *State v. Fell*, 203 Ariz. 186, 189, ¶ 11 (App. 2002); *accord Bayardi*, 230 Ariz. at 200, ¶ 19. Nothing in A.R.S. § 28-661, or elsewhere in Title 28, suggests that self-defense may be offered to justify leaving the scene of a fatal accident. Because the limitation of self-defense to Title 13 offenses reflects a policy decision entrusted to the legislature, whether to extend justification to A.R.S. § 28-661 must be determined by the legislature, not the courts. *See State v. Gray*, 239 Ariz. 475, 480, ¶ 21 (2016).

¶14    Moreover, Sulu-Kerr has not shown that limiting self-defense to Title 13 crimes infringes her constitutional rights. Although she relies on federal and state constitutional provisions enshrining the right to bear arms as a basis for extending self-defense to charges falling under Title 28, *see* U.S. Const. amend. II ("A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."); Ariz. Const. art. 2, § 26 ("The right of the individual citizen to bear arms in defense of himself or the state shall not be impaired . . . ."), she fails to explain how legislation criminalizing the use of force encroaches on the constitutional right to bear arms, *cf. Calderone v. City of Chicago*, 979 F.3d 1156, 1162–63 (7th Cir. 2020) (observing that carrying arms and using arms "are separate and distinct interests under the Second Amendment" and that U.S. Supreme Court precedent has not established a constitutional right to shoot someone in self-defense).

   II.    *Defense of an Occupied Vehicle as a Justification to Aggravated Assault and Reckless Manslaughter*[3]

---

[3]    After reviewing the appellate briefs and the trial court record, we ordered the parties to provide supplemental briefing addressing an issue indirectly referenced in their briefs—whether the trial court erred by failing to instruct the jurors on the defense of an occupied vehicle under A.R.S. § 13-418.

¶15        Sulu-Kerr argues the trial court erred by failing to instruct the jurors on the defense of an occupied vehicle justification under A.R.S. § 13-418. Asserting the instructions given "left the jury with an incorrect understanding of justification defenses," Sulu-Kerr contends the omission constituted fundamental, prejudicial error.

¶16        Before trial, Sulu-Kerr requested the jury be instructed on self-defense using several Revised Arizona Jury Instructions ("RAJI"). *See* RAJI (Crim.) Justification for Self-Defense 4.04, at 59-61; Justification for Self-Defense Physical Force 4.05, at 62-64; Justification for Defense of a Third Person 4.06, at 64-65 (5th ed. 2019). As noted, the State moved to preclude these self-defense justifications regarding the counts of leaving the scene of a fatal accident and theft of means of transportation, which the trial court granted. The State also requested a jury instruction for the defense of property under A.R.S. § 13-408 (justifying the "us[e] [of] physical force against another . . . to prevent what a reasonable person would believe is an attempt or commission by the other person of theft"), arguing Sulu-Kerr "[wa]s not justified in using physical force to stop" J.B. and M.B. from "trying to recover their vehicle." In response, Sulu-Kerr countered that J.B. and M.B. "were absolutely NOT entitled to use force to regain 'their perceived personal property.'"

¶17        During the settling of final jury instructions, the prosecutor withdrew the State's request for an instruction on the defense of property justification, pointing to his inability "to find" J.B. and present supporting testimony at trial. Defense counsel, for his part, reasserted his objection to the court's ruling precluding application of the self-defense instructions to the count of leaving the scene of a fatal accident but raised no other objection to the self-defense instructions as outlined by the trial court.

¶18        "We review de novo whether a trial court properly instructed the jury, and whether [the given] jury instructions properly state the law." *State v. Ewer*, 254 Ariz. 326, 329, ¶ 10 (2023) (internal quotations and citations omitted). In so doing, "[w]e consider the jury instructions as a whole to determine whether the jury received the information necessary to arrive at a legally correct decision." *Id.* (internal quotation omitted).

¶19        Although Sulu-Kerr disputed the State's assertion that A.R.S. § 13-408 authorized J.B. and M.B. to forcefully take possession of the Ford, she did not request an instruction on the defense of an occupied vehicle justification or otherwise challenge the sufficiency of the given self-defense instructions. Because Sulu-Kerr failed to adequately raise a challenge to the omission of an instruction on the defense of an occupied vehicle under

A.R.S. § 13-418 in the trial court, we review her appellate challenge only for fundamental, prejudicial error. *See* Ariz. R. Crim. P. 21.3(b) (providing that "[a]ny objection to the court's giving or failing to give any instruction . . . must be made before the jury retires to consider its verdict. . . . If a party does not make a proper objection, appellate review may be limited"); *see also State v. Gendron*, 168 Ariz. 153, 154 (1991); *State v. Gallegos*, 178 Ariz. 1, 12 (1994) ("[A] trial judge's failure to give an instruction *sua sponte* provides grounds for reversal only if such failure is fundamental error.").

**¶20** On fundamental error review, "the omission [of an instruction] must be evaluated in light of the totality of the circumstances," *Gendron*, 168 Ariz. at 155, and "[w]e will not reverse a conviction unless we can reasonably find that the instructions, when taken as a whole, would mislead the jurors." *State v. Sierra-Cervantes*, 201 Ariz. 459, 462, ¶ 16 (App. 2001) (internal quotation and citation omitted). To prevail under the fundamental error standard, a defendant must show an error that "goes to the foundation of a case, takes away an essential right, or is so egregious that [the] defendant could not have received a fair trial." *State v. Murray*, 250 Ariz. 543, 548, ¶ 14 (2021) (internal quotation and citation omitted). Although the defendant bears the burden of persuasion at each step of the analysis, she "need only establish one prong to prove fundamental error exists." *Id.* at 548–50, ¶¶ 14, 20. "An error takes away an 'essential right' if it deprives the defendant of a constitutional or statutory right necessary to establish a viable defense or rebut the prosecution's case." *Id.* at 551, ¶ 24 (quotation and citation omitted). To establish prejudice, a defendant must show that "without the fundamental error, a reasonable jury . . . *could have* reached a different [verdict]." *Id.* at 548, ¶ 14 (internal quotation and citation omitted).

**¶21** No error occurs when a trial court omits a particular instruction if the instructions given "fairly represent[] the applicable law." *State v. Axley*, 132 Ariz. 383, 392 (1982). But "the court has an independent duty to instruct on the law when the matter is vital to a proper consideration of the evidence, even if the particular instruction is not requested," *State v. Almaguer*, 232 Ariz. 190, 193, ¶ 5 (App. 2013), and the failure to do so constitutes fundamental error, *State v. Edmisten*, 220 Ariz. 517, 522, ¶ 11 (App. 2009) ("With regard to jury instructions, fundamental error occurs when the trial judge fails to instruct upon matters vital to a proper consideration of the evidence.") (internal quotation and citation omitted). Jury instructions must not "mislead[] the jury." *Ewer*, 254 Ariz. at 329, ¶ 11.

**¶22** To resolve this issue, we examine the final jury instructions and the related statutes governing self-defense and justification, mindful

that "[j]ustification is not an affirmative defense that the defendant must prove." *State v. King*, 225 Ariz. 87, 89, ¶ 6 (2010). Rather, when a defendant presents any evidence of self-defense, the State must prove "beyond a reasonable doubt that the defendant did not act with justification." *Id.* (quoting A.R.S. § 13-205(A)).

**¶23**      The trial court provided the following instructions to the jury, in relevant part:

> 4.04 – [J]ustification for [S]elf[-][D]efense
>
> A defendant is justified in using or threatening physical force in self[-]defense if the following two conditions existed:
>
> 1. A reasonable person in the situation would have believed that physical force was immediately necessary to protect against another's use or apparent[,] attempted[,] or threatened use of *unlawful* physical force; and[,]
>
> 2. The defendant used or threatened no more physical force than would have appeared necessary to a reasonable person in the situation.
>
> . . .
>
> The threat or use of physical force is not justified:
>
> 1. In response to verbal provocation alone;
>
> 2. To resist an arrest that the defendant knew or should have known was being made by a peace officer or by a person acting in a peace officer's presence and at the peace officer's direction, whether the arrest was lawful or unlawful, unless the physical force used by the peace officer exceeded that allowed by law; or[,]
>
> 3. If the defendant provoked the other's use of *unlawful* physical force, unless:
>
>    a. The defendant withdrew from the encounter or clearly communicated to the other person the defendant's intent to withdraw, reasonably believing that the defendant could not withdraw from the encounter; and[,]

b. The other person nevertheless continued or attempted to use *unlawful* physical force against the defendant.

. . .

4.05 – Justification For Self-Defense Physical Force

A defendant is justified in using or threatening deadly physical force in self-defense if the following two conditions existed:

1. A reasonable person in the situation would have believed that deadly physical force was immediately necessary to protect against another's use or apparent attempted or threatened use of *unlawful* deadly physical force; and[,]

2. The defendant used or threatened no more deadly physical force than would have appeared necessary to a reasonable person in the situation.

. . .

A defendant has no duty to retreat before threatening or using deadly physical force in self-defense if the defendant:

1. *Had a legal right to be in the place* where the use or threatened deadly physical force in self-defense occurred; and[,]

2. *Was not engaged in an unlawful act at the time* when the use or threatened deadly physical force in self-defense occurred.

4.06 – Justification for Defense of a Third Person

A defendant is justified in using or threatening physical force in defense of a third person if the following two conditions existed:

1. A reasonable person in the situation would have believed that physical force was necessary to protect against another's use, attempted use, apparent attempted use, or

9

threatened use of *unlawful* physical force against a third person; and[,]

2. The defendant used or threatened no more physical force than would have appeared necessary to a reasonable person in the situation.

3. A defendant may use deadly physical force in defense of a third person only to protect against another's use, attempted use, apparent attempted use, or threatened use of deadly physical force.

(Emphasis added.)

¶24　　　　Read together, these instructions told the jurors that a defendant is justified in using deadly physical force only if: (1) reasonably necessary to protect against another's use of *unlawful* physical force, and (2) the defendant either retreats (or conveys an intent to retreat) *or* has a legal right to be at the place *and* is not engaged in an unlawful act. Unlike the instructions given, which track A.R.S. §§ 13-404 to -406, the defense of an occupied vehicle justification under A.R.S. § 13-418 provides that:

A. *Notwithstanding any other provision* of this chapter, a person is *justified* in threatening to use or using physical force or *deadly physical force* against another person if the person reasonably believes himself or another person to be in imminent peril of death or serious physical injury and the *person against whom* the physical force or deadly physical force is threatened or used was in the process of unlawfully *or forcefully* entering, or had unlawfully or forcefully entered, a residential structure or occupied vehicle, or had removed *or was attempting to remove another person against the other person's will* from the residential structure or occupied vehicle.

B. A person has *no duty to retreat* before threatening or using physical force or deadly physical force pursuant to this section.

(Emphasis added.)

¶25　　　　Unconstrained by any other Title 13 statute and broader in scope than A.R.S. §§ 13-404 through -406, A.R.S. § 13-418 justifies the use of

deadly physical force by the occupant of a vehicle against the threat of serious physical injury or death posed by a person in the process of forcefully entering the vehicle or attempting to remove the occupant from the vehicle, even if the other person's actions are not unlawful. Arizona case law "has long rejected" the argument that a self-defense instruction "adequately cover[s]" justification because the underlying statutes protect against separate harms. *See State v. Almeida*, 238 Ariz. 77, 81–83, ¶¶ 17–23 (App. 2015) (characterizing crime prevention justification as "more permissive" than self-defense). Under a theory of basic self-defense, a defendant may act only to protect herself or a third party against another's use of unlawful force, A.R.S. §§ 13-404 to -406, but under a theory of justification, there is no requirement of unlawful conduct; forceful conduct, alone, is sufficient. *See* A.R.S. § 13-418(A); *see also Almeida*, 238 Ariz. at 80–81, ¶ 13. In other words, "[i]t is of no import that a victim may have justifiably used or threatened force because the legality of the victim's conduct is immaterial to a justification analysis." *Ewer*, 254 Ariz. at 330, ¶ 19. Equally important, A.R.S. § 13-418, unlike its basic self-defense counterparts, A.R.S. §§ 13-404 to -406, imposes no duty on the occupant of a vehicle to retreat in the face of a forceful entry or removal, even if the forceful entry or removal occurs during the occupant's commission of an unlawful act.

¶26 To determine whether the "independent duty" to instruct jurors on all law "vital to a proper consideration of the evidence" compelled the trial court, *sua sponte*, to provide an instruction on the defense of an occupied vehicle justification, *Almaguer*, 232 Ariz. at 193, ¶ 5, we must view the trial evidence in Sulu-Kerr's favor, *Almeida*, 238 Ariz. at 80, ¶ 10 ("In assessing the propriety of the justification instruction, . . . we must view the evidence in the light most favorable to [the defendant]."). The evidence presented at trial favoring the defense, if believed, would allow a rational jury to conclude that J.B. and M.B. aggressively approached the Ford and, acting together, forcefully attempted to either enter the Ford or remove Sulu-Kerr from the vehicle.

¶27 The evidence would also allow a reasonable jury to find that Sulu-Kerr reasonably believed that driving forward to flee the gas station was immediately necessary to prevent serious physical harm to herself or M.Y. Because A.R.S. § 13-418 establishes a different and more permissive legal standard for evaluating Sulu-Kerr's conduct than that imposed under A.R.S. §§ 13-404 to -406, the trial evidence not only supported an instruction on the defense of an occupied vehicle justification, it compelled the inclusion of the instruction. "That the evidence of justification was fairly debatable and contradicted by other evidence is irrelevant." *Almeida*, 238

Ariz. 80, ¶ 11. Simply put, without an instruction on the defense of an occupied vehicle justification, the instructions given failed to inform the jury of the law vital to its proper consideration of the evidence.

¶28        Without citing any authority, the State argues that attempting to open a vehicle's door and reaching inside an open driver-side window while ordering the driver to get out and claiming ownership of the vehicle "cannot constitute the 'forcefully entering' required by the statute." We disagree.

¶29        The legislature did not define "forcefully," *see* A.R.S. §§ 13-105, -418, and had it intended to impose some heightened standard beyond physically attempting to access the interior of a vehicle and expel the occupant without the occupant's permission or acquiescence, it surely would have said so.

¶30        The State also argues that the evidence did not support a defense of an occupied vehicle instruction because M.B. was positioned at the front of the vehicle when Sulu-Kerr ran him over, and therefore could not have been forcefully attempting to enter the vehicle or remove her at the time. But the State's narrow focus on M.B.'s position when he was struck by the Ford fails to account for the uncontroverted evidence that J.B. and M.B. acted in concert. Without question, M.B. stood in front of the Ford when Sulu-Kerr drove forward, blocking her from leaving, while J.B., according to at least some evidence, attempted to open the driver-side door and reached inside the driver-side window. Because J.B. and M.B. acted together in attempting to forcefully take possession of the Ford, the defense of an occupied vehicle justification applied to Sulu-Kerr's conduct directed at both men. *Cf.* A.R.S. § 13-401 ("Even though a person is justified under this chapter in threatening or using physical force or deadly physical force against another, if in doing so such person recklessly injures or kills an innocent third person, the justification afforded by this chapter is unavailable in a prosecution for the reckless injury or killing of the innocent third person.").

¶31        The trial court committed fundamental error by failing to instruct on the defense of an occupied vehicle justification. Having found fundamental error, we must determine whether Sulu-Kerr suffered prejudice as a result.

¶32        To establish prejudice, a defendant must show that had the trial court provided proper instructions, "a reasonable jury could have plausibly and intelligently returned a different verdict." *Murray*, 250 Ariz.

at 552, ¶ 30 (internal quotation and citation omitted). "An erroneous jury instruction could lead an objective, reasonable jury to reach a different verdict if the error relates to the defense against the charge." *State v. Fierro*, 254 Ariz. 35, 42, ¶ 25 (2022). "[E]valuating prejudice . . . requires a court to examine the entire record—including jury instructions—*in context* with counsel's arguments." *Murray*, 250 Ariz. at 553, ¶ 37. In other words, "[a]ppellate courts do not evaluate jury instructions out of context. Closing arguments of counsel may be taken into account when assessing the adequacy of jury instructions." *State v. Bruggeman*, 161 Ariz. 508, 510 (App. 1989). While a prosecutor's closing argument may ameliorate an erroneous jury instruction by "clarif[ying] any possible misunderstanding," *id*., it may also compound the prejudice of an erroneous instruction, *State v. Johnson*, 205 Ariz. 413, 417, 420, ¶¶ 11, 26 (App. 2003) (finding an "incomplete" instruction, "in conjunction with the closing arguments of counsel," warranted reversal).

**¶33**        During closing argument, the prosecutor repeatedly highlighted the jury instructions, arguing that Sulu-Kerr did not fear serious physical harm when she hit M.B. and drove away but instead felt concerned that she would be caught with a stolen vehicle.[4] The prosecutor also told the jurors that Sulu-Kerr had a duty to retreat:

> The question that you need to decide on [the aggravated assault and manslaughter counts] is was this self-defense? That is the main question. And many of you might put yourself in her shoes, and you're going to have to because that's what the instruction tells you to do, a reasonable person in that situation.
>
> So you might be thinking if I was driving my vehicle and if I pulled into the Circle K and it's about 4:00 in the morning, 4:50 in the morning, and two men come out of nowhere and approach me and start yelling at me and start banging on my vehicle, I'm gone. Many of you, if not all of you, probably would do that. I certainly would. What's different, though? The difference is this is not her vehicle. She's driving a stolen vehicle. So what's actually going on through her head? Is it

---

4       At trial, Sulu-Kerr argued that the State failed to present evidence demonstrating she knew the Ford was stolen, but the jury rejected her argument, and she does not challenge the theft of means of transportation verdict on appeal.

that I'm afraid for my life or is it I'm driving a stolen vehicle, and there's the owners?

. . .

A defendant has no duty to retreat before threatening or using deadly physical force if . . . they were not engaged in an unlawful act at the time. If you believe she knowingly was in possession of a stolen vehicle, that she is guilty of [theft of means of transportation], then she is committing an unlawful act at this time, in which case she had a duty to retreat. She had to choose to run before she chose to run him over.

. . .

The story doesn't match the evidence. Because it's a story. Lies that are needed to create a story.

It's because the real reason this happened is because she was in a stolen vehicle. That's what the evidence shows, and that's what I present to you.

And if you believe that I proved that beyond a reasonable doubt, then this wasn't self-defense. Because she wasn't afraid for her life. She was afraid of getting caught. I have to disprove that.

If you find that the reason for the story is nonsense; that her actions showed that everything in this case shows you to know that she was in the stolen car and she knew and that's why she ran and that's why she did these things, then you should find her guilty on both aggravated assault and manslaughter.

She had a duty to retreat. And she did not. Because of that, self-defense does not apply.

¶34        By asserting that Sulu-Kerr's possession of the stolen vehicle imposed upon her a duty to retreat and inviting the jurors to reject her claim of self-defense on that basis, the prosecutor both mischaracterized the law and compounded the prejudice from the incomplete statement of the law reflected in the given instructions. *Compare Fierro*, 254 Ariz. at 43, ¶ 31 (concluding no resulting prejudice from an erroneous jury instruction, partly reasoning that the prosecutor "did nothing to exploit" the

instruction). Because the prosecutor made these statements after quoting the instruction on when a defendant "has no duty to retreat," jurors likely interpreted his statements as accurately reflecting the law. *See Murray*, 250 Ariz. at 552, 554, ¶¶ 33, 39 (observing that the standard jury instruction that what lawyers say during closing arguments "is not evidence . . . but . . . may help you understand the law and the evidence" made jurors more likely to accept the prosecutor's misstatement of the law as a correct application of it). And in so doing, the prosecutor essentially relieved the State of the burden of proving Sulu-Kerr acted without justification for purposes of aggravated assault and reckless manslaughter.

¶35 Because Sulu-Kerr's primary, if not sole, defense against the aggravated assault and manslaughter charges was justification—that she reasonably fled the gas station after J.B. and M.B. rushed the Ford, and J.B. attempted to open the car door and reach inside the driver-side window while ordering her to get out—the prosecutor's erroneous statement that self-defense did "not apply" if jurors found her guilty of theft of means of transportation took away a right essential to her defense. *See State v. Escalante*, 245 Ariz. 135, 141, ¶ 19 (2018). Thus, in this case, "[t]he prosecutor did not merely misstate the [standard for a duty to retreat]; he provided the jury a logical roadmap to circumvent it while ostensibly following it." *Murray*, 250 Ariz. at 554, ¶ 39. Moreover, contrary to the State's argument, the record demonstrates that the incomplete instructions and closing argument influenced the jury's evaluation of the case. Specifically, during deliberations, the jury asked for a "definition of [r]etreat." *See Escalante*, 245 Ariz. at 144, ¶ 32 ("[A]ny questions posed by jurors during trial or deliberation may be pertinent in applying the [prejudice] standard objectively.").

¶36 Although the State contested Sulu-Kerr's self-defense claim, the trial evidence did not overwhelmingly negate it. Sulu-Kerr gave consistent accounts of what happened, and the fear she felt, when she spoke to Rodriguez, her daughter, and the police after the event. Surveillance video only partially captured the encounter, and J.B. did not testify at trial. In fact, the prosecutor acknowledged that if he "pulled into" a gas station at 4:00 in the morning "and two men [came] out of nowhere and approach[ed] [him] and start[ed] yelling at [him] and start[ed] banging on [his] vehicle," he "certainly would" take off.

¶37 Given the trial court's failure to instruct the jury on the law vital to its proper consideration of the evidence and the prosecutor's mischaracterization of the law during closing argument, a reasonable jury could have understood that an irrebuttable presumption existed such that

Sulu-Kerr necessarily acted without justification for purposes of aggravated assault and reckless manslaughter if she committed theft of means of transportation, no matter the other evidence. *See Norton v. Superior Court*, 171 Ariz. 155, 158 (App. 1992) ("Conclusive or irrebuttable presumptions unconstitutionally relieve the State of its burden of proof."); *see also State v. Abdi*, 226 Ariz. 361, 364–65, ¶¶ 11, 13 (App. 2011) (similar). But had the trial court properly instructed on the law vital to a proper consideration of the evidence, including the defense of an occupied vehicle justification under A.R.S. § 13-418, a reasonable jury could have plausibly and intelligently found Sulu-Kerr's conduct to be justified. *See Murray*, 250 Ariz. at 552–53, ¶¶ 31–34 (concluding that a reasonable jury could have reached a different result without the prosecutor's error because the error went to the foundation of the defense, which otherwise had considerable evidence to support it). Therefore, the omission of an instruction on the defense of an occupied vehicle justification constituted fundamental, prejudicial error, and we vacate the convictions for aggravated assault and negligent homicide accordingly.[5]

### III.    *Instruction for Leaving the Scene of a Fatal Accident*

**¶38**        Sulu-Kerr argues the trial court erred by instructing jurors that she could be found guilty of A.R.S. § 28-661, leaving the scene of a fatal accident, if she violated any of the requirements enumerated in A.R.S. § 28-663 — which is a less serious crime standing alone and with which she was not separately charged. *Compare* A.R.S. § 28-661(C) (categorizing offense as class 2 or class 3 felony) *with* A.R.S. § 28-663(C), (D) (categorizing offense as misdemeanor or class 6 felony). Because Sulu-Kerr did not object

---

[5]        Because we conclude the trial court failed to instruct the jury on all law vital to its proper consideration of the evidence and vacate the convictions for aggravated assault and negligent homicide on that basis, we need not address Sulu-Kerr's claims that: (1) the prosecutor improperly referenced her subjective motivation during closing argument, (2) the jury impermissibly returned inconsistent verdicts on the counts of aggravated assault and reckless manslaughter, and (3) the trial court erroneously ran her sentence for leaving the scene of a fatal accident consecutive to her sentences for aggravated assault and negligent homicide.

to the instruction, we review her claim only for fundamental error.[6] *See Escalante*, 245 Ariz. at 138, ¶ 1.

**¶39** This claim raises an issue of statutory interpretation. We interpret statutes *de novo*, looking first at the text. *Holle*, 240 Ariz. at 302, ¶¶ 8, 11. We do not interpret statutory provisions in a vacuum but "in view of the entire text, considering the context and related statutes on the same subject." *Nicaise v. Sundaram*, 245 Ariz. 566, 568, ¶ 11 (2019). "When the text is clear and unambiguous, we apply the plain meaning and our inquiry ends." *State v. Burbey*, 243 Ariz. 145, 147, ¶ 7 (2017).

**¶40** Under A.R.S. § 28-661(A),[7] a driver involved in a fatal accident has an affirmative duty to:

> 1. Immediately stop the vehicle at the scene of the accident or as close to the accident scene as possible but shall immediately return to the accident scene.
>
> 2. Remain at the scene of the accident until the driver has fulfilled the requirements of § 28-663.

A driver "who fails to stop or to comply with the requirements of § 28-663" is guilty of a class 2 or class 3 felony, depending on whether the driver caused the accident. A.R.S. § 28-661(C).

**¶41** Section 28-663 requires that a driver involved in a fatal accident:

> 1. Give the driver's name and address and the registration number of the vehicle the driver is driving.
>
> 2. On request, exhibit the person's driver license to the person struck or the driver or occupants of or person attending a vehicle collided with.

---

[6] Sulu-Kerr argued she was entitled to a directed verdict on the charge of leaving the scene of an accident because the State could not prove she violated all three requirements of A.R.S. § 28-663. But she never objected to the court's jury instructions on leaving the scene of a fatal accident under A.R.S. § 28-661 or the requirements of A.R.S. § 28-663.

[7] We cite the current version of A.R.S. §§ 28-661 and -663. Although each statute has been amended since Sulu-Kerr committed the offense, the amendments do not affect our analysis.

3. Render reasonable assistance to a person injured in the accident, including making arrangements for the carrying of the person to a physician, surgeon or hospital for medical or surgical treatment if it is apparent that treatment is necessary or if the carrying is requested by the injured person.

A.R.S. § 28-663(A).

**¶42**      The trial court instructed jurors on the charge of leaving the scene of a fatal accident as follows:

The crime of leaving the scene of an injury or fatal accident requires that the defendant:

One, was driving a vehicle involved in an accident resulting in injury to or death of any person and, A, failed to immediately stop the vehicle at the scene of the accident, or as close to the accident scene as possible and immediately return to the accident scene; B, or failed to remain at the scene of the accident until the defendant fulfilled the duties required by law of a driver involved in an accident resulting in an injury or death.

. . .

The driver of a vehicle involved in an accident resulting in injury to or death of a person shall:

One, give the driver's name and address and the registration number of the vehicle the driver was driving; and, two, on request, exhibit the person's driver's license to the person struck or the driver or occupants of or person attending a vehicle collided with; and, three, render reasonable assistance to a person injured in the accident, including making arrangements for the car[ry]ing of the person to a physician, surgeon, or hospital for medical or surgical treatment if it is apparent that treatment is necessary or if the car[ry]ing is requested by the injured person.

**¶43**      We discern no error in the trial court's instruction on leaving the scene of a fatal accident because the text of A.R.S. § 28-661 is unambiguous and the instruction accurately tracked it. Subsection (A) of the statute provides that a driver may be found guilty of A.R.S. § 28-661 if the driver either (1) failed to immediately stop or return to the accident

scene or (2) did not provide the information and assistance described in A.R.S. § 28-663.

**¶44**     Sulu-Kerr cites *State v. Powers*, 200 Ariz. 363 (2001), to support her contention that A.R.S. § 28-661 does not strictly incorporate the requirements of A.R.S. § 28-663. In *Powers*, our supreme court stated:

> Section 28-661 imposes an affirmative duty on a driver to remain "at the scene of the accident," not to render aid to victims or provide them with information. Although § 28-661(A)(2) requires the driver to remain at the scene "*until* the driver has fulfilled the requirements of § 28-663," (emphasis added), that clause only establishes when the duty to remain at the scene terminates.

*Id.* at 364, ¶ 8 (quotation omitted). But Sulu-Kerr's reliance on *Powers* is unavailing because it does not account for the above statement's context. *Powers* did not consider whether A.R.S. § 28-661 incorporates A.R.S. § 28-663. Rather, the case concerned whether a defendant could be charged with multiple counts of leaving the scene of an accident under A.R.S. § 28-661 if the defendant was involved in an accident that affected more than one victim. *Powers*' observation that A.R.S. § 28-661 does not impose a duty to "render aid to the victims or provide them with information" did not dissociate the requirements of A.R.S. § 28-663 from A.R.S. § 28-661 but emphasized that the plain language of A.R.S. § 28-661 focuses on an "accident" or "accident scene" rather than a "victim."

## CONCLUSION

**¶45**     For the foregoing reasons, we affirm the convictions and sentences for theft of means of transportation and leaving the scene of a fatal accident. Because the jury was improperly instructed on justification, we vacate the convictions and sentences for aggravated assault and negligent homicide and remand the matter for a new trial on the underlying counts.

